August 13, 2009

**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**



|  |  |
|---|---|
| **THE EQUAL RIGHTS CENTER**<br>a not-for-profit organization,<br>11 Dupont Circle, NW, Suite 400<br>Washington, DC 20036<br><br>Plaintiff,<br><br>vs.<br><br>**KETTLER,**<br><br>a Virginia corporation,<br>1751 Pinnacle Drive, Suite 700<br>McLean, Virginia 22102<br><br>and<br><br>**KETTLER MANAGEMENT CORP.,**<br><br>a Virginia corporation,<br>1751 Pinnacle Drive, Suite 700<br>McLean, Virginia 22102<br><br>Defendants. | Case No. 1:07-cv-01017<br>Judge Reggie B. Walton |

## SETTLEMENT AGREEMENT AND CONSENT DECREE

**INTRODUCTION**

I. The Equal Rights Center (the "ERC"), and Kettler Inc., and Kettler Management Inc., (collectively "KETTLER"), (the ERC and KETTLER are collectively referred to as the "Parties"), have agreed to enter into this Settlement Agreement and Consent Decree ("Agreement") in order to fully and finally resolve the claims raised by the ERC in its Complaint in this action (the "Complaint"), including, but not limited to, the ERC's allegations that KETTLER failed to design and construct certain apartment buildings and condominium complexes in accordance with the Fair Housing Act (the "FHA"), 42 U.S.C. § 3604(f)(1), (2) & (3)(C), and failed to design and construct places of public accommodation associated with those apartment buildings and condominium complexes in compliance with the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12183(a)(1).

II. KETTLER has denied the allegations of the Complaint, and ERC recognizes that KETTLER has represented that it acted in good faith and had no intention to avoid the requirements of the FHA and ADA. Nothing in this Agreement constitutes or may be construed as an admission of liability as to the allegations of the ERC, all of which are expressly denied by KETTLER.

III. The Parties agree that this Court has jurisdiction over the subject matter of this action. The Parties further agree that the controversy should be resolved without findings of fact or further proceedings. Therefore, the Parties have consented to the entry of this Agreement as indicated by the authorized signatures appearing below. The provisions of this Agreement will be binding on the ERC and KETTLER, their respective subsidiaries and their successors and assigns, for a period defined in paragraph J.1, below.

 It is therefore **ORDERED, ADJUDGED AND DECREED that:**

A.  **PARTICIPATION IN MULTIFAMILY HOUSING RESOURCE PROGRAM**

1.  KETTLER agrees to become a member of the Equal Rights Center Multifamily Housing Resource Program (the "MHRP" or the "Program") commencing as of January 1, 2009, and agrees to pay an annual membership fee in the amount of Twenty-Five Thousand Dollars ($25,000.00) each year for ten years, beginning in 2009. The initial payment under this paragraph will be made via wire transfer to the ERC within five (5) business days of the entry of this Agreement, and subsequent annual payments will be made by the same means no later than January 15, each year thereafter. KETTLER will receive the services set forth in Paragraph A.4, B and C below without payment of any additional compensation to the ERC.

2.  The ERC retains the right to terminate KETTLER'S participation in the MHRP on reasonable notice. If KETTLER's participation is terminated by the ERC, any monetary obligation of KETTLER to the MHRP for its annual membership payment will also terminate.

3.  The Parties agree that the ERC will not initiate any lawsuit or administrative action against KETTLER or its affiliates, co-owners, partners, successors, agents and assigns, even upon KETTLER's termination of membership in the MHRP, alleging violations of the design and construction provisions of the FHA or ADA with respect to any Remediation Property or other multifamily properties, in which KETTLER is or was involved in the design or construction process, for which a building permit was issued prior to entry of this Agreement or during KETTLER's membership in the Program, but that the Parties will instead submit any such matter to mutually binding arbitration in accordance with the following procedures:

    a.  Any dispute, claim, or controversy arising out of or relating to this paragraph, including the determination of the scope or applicability of this paragraph, shall be determined by arbitration in Washington, D.C. before a single arbitrator. The arbitration will be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures. The decision of the arbitrator will be enforceable in any court having jurisdiction.

    b.  Subject to subparagraph c below, each Party to the arbitration will bear its costs for preparing and participating in the arbitration, including the costs of counsel, experts, and presentation materials. The Parties to the arbitration will share equally the cost of the arbitrator's fees.

- 3 -

    c.    At the conclusion of an arbitration, the prevailing party will receive payment of its reasonable costs of counsel, experts, and presentation materials as allowed by the fee-shifting provisions of the FHA, as interpreted by the various federal courts.

    d.    Notwithstanding this paragraph, this Agreement may be enforced in any court having jurisdiction should either party refuse to honor its obligations hereunder.

4.    If a third-party lawsuit or administrative action is brought against KETTLER relating to the accessibility requirements of the FHA or ADA, and if requested by Kettler, the ERC will provide truthful testimony as to the activities of the Program and any affirmative actions to enhance accessibility being taken specifically by KETTLER or other Program members by participation in the Program.

## B.   EDUCATION AND TRAINING

Within 180 days of the entry of this Agreement, KETTLER will ensure that certain of its employees who are directly involved in the design and/or construction of covered multifamily dwellings, including at least three persons for each KETTLER division who have control and influence over ensuring compliance with accessibility requirements, attend fair housing training with specific emphasis on compliance with the accessibility requirements of the FHA and ADA, and will secure a signed statement, attached hereto as Appendix 1, from each employee acknowledging that he/she has received this training. This training will be provided by the ERC under the auspices of the MHRP once per quarter at no additional charge to KETTLER.

## C.   PUBLIC NOTICE OF NON-DISCRIMINATION POLICY

Within 180 days of the entry of this Agreement, the ERC will review and comment on KETTLER's practices related to public notice of its nondiscrimination policy and nondiscrimination in advertising and will assist KETTLER in implementing reasonable changes for compliance if any are necessary. This review and assistance will be provided by the ERC under the auspices of the MHRP at no additional charge to KETTLER.

## D.    <u>CORRECTIVE ACTIONS FOR AGREEMENT PROPERTIES</u>

1.    <u>Properties Subject To Agreement:</u> KETTLER represents that it has, in Appendix 2, identified all multifamily housing properties in which it holds an ownership interest that are subject to this Agreement. These properties are categorized for purposes of this Agreement as

      a.    "Category IA Properties" are those listed as IA Properties on Appendix 2,

      b.    "Category IB Properties" are those listed as IB Properties on Appendix 2,

      c.    "Category II Properties" are those listed as II Properties on Appendix 2, and

      d.    "Category IIa Properties" are those listed as IIa Properties on Appendix 2..

Collectively, the Category IA, Category IB, Category II and Category IIa Properties are referred to as the "Remediation Properties." Should KETTLER offer more than 5% of units in any Category IB property for rent at any time prior to the expiration of this Agreement, each such covered dwelling unit located at the property shall be treated as if it were a dwelling unit at a Category IA Property and such Property shall be subject to all of the provisions in this Agreement applicable to Category IA Properties. Condominium units previously sold or that are being held for sale at such properties are not subject to this paragraph. The Remediation Properties do not include any properties that KETTLER did not design and or construct or that Kettler Management operates or manages for unaffiliated, third party entities.

2.    <u>Remediation--Category IA Properties:</u>

      a.    All Category IA Properties will be surveyed by a jointly agreed-upon consultant ("Consultant"). At or prior to the time of execution of this Agreement, the ERC shall provide a list of four ERC-approved consultants. If KETTLER agrees to one of these ERC-designated consultants, KETTLER shall only be responsible for the costs and expenses incurred by that consultant. If the Parties are not able in good faith to agree on a consultant, the Parties will each designate a consultant ("Consultants"). The Consultants will attempt to work cooperatively with each other in providing joint reports. If they are unable to agree, they will notify the Parties of the disagreement and the Parties will resolve the issue in accordance with the dispute resolution terms contained in

Paragraph J.3 of this Consent Decree. The costs and expenses of these Consultants shall be borne by KETTLER.

b.      Within 90 days of the date of entry of this Agreement by the Court, KETTLER will, in consultation with the Consultant(s), provide the ERC with a schedule of the Initial Surveys to be conducted at each of the Category IA Properties (the "Survey Schedule").

c.      The Consultant(s), with the cooperation of KETTLER, will conduct an Initial Survey at each Category IA Property to determine the existence and scope of any deficiencies in conformity with the "Safe Harbors"[1]. The Consultant shall not consider a particular element to be deficient unless it fails to meet the requirments of all of the Safe Harbors (it being agreed that multiple Safe Harbors may be applied to each Remediation Property).

d.      The Consultant(s) and KETTLER will use commercially reasonable efforts to complete all such Initial Surveys within three months from the date the Survey Schedule is agreed upon.

e.      The Consultant(s) will provide the Parties with a written report of each Initial Survey within 14 days of the completion of that survey. The report shall be labeled "confidential" and shall not be shared with any third-parties (other than counsel for the parties) without the consent of Kettler.

f.      KETTLER and/or the ERC may, at their own individual expense, designate a representative(s) to observe such Initial Surveys as they deem appropriate.

g.      All expenses related to the Initial Surveys under Paragraphs D.2.a and D.3.a will be borne by KETTLER.

h.      Within 30 days of receipt of the Initial Survey report for each Category IA Property, the Parties will make a good faith effort to agree on the alterations, if any, to be made in that Property ("Property Alteration Agreement") in accordance with the provisions of Paragraphs D.2.j-k below. Each Property Alteration

---

[1] "Safe Harbor" means any of the following: (a) ANSI A1117.1 (1986), the Fair Housing Accessibility Guidelines (HUD, 1991); the Fair Housing Design Manual (1998); the Guidelines and Supplemental Questions and Answers (HUD, June 28, 1994); CABO/ANSI A117.1 (1992); ICC/ANSI A1171.1(1998); the Code Requirements for Housing Accessibility (CRHA, 2000); the International Building Code (2000, with 2001 Supplement); the International Building Code (2003); the International Building Code (2006); and (b) any other Safe Harbor recognized by HUD. To the extent KETTLER relies upon ANSI standards as a Safe Harbor, those standards will be read in conjunction with the Fair Housing Act, HUD's regulations, and the HUD Fair Housing Accessibility Guidelines.

Agreement will detail the Parties' understandings regarding the alterations to the covered dwelling units and the common use and public use areas of the Category IA Property so as to bring the Property into compliance as discussed in Paragraphs D.2.j-k below (the "Alteration"). A "form" Property Alteration Agreement is provided at Appendix 3.

i.    The Parties will endeavor in good faith to resolve informally any issues regarding the terms of Property Alteration Agreements and KETTLER's compliance therewith prior to bringing the issues to the Court for resolution.

j.    KETTLER will cause each Category IA Property to be altered so as to conform to provisions of one or more "Safe Harbors" recognized under the FHA and ADA except as provided herein.

k.    KETTLER's conformance with one or more Safe Harbors is subject to the Remediation Tolerances set forth in Appendix 4, and such other requirements or exceptions as may be agreed to by the Parties.

3.    Remediation—Common Areas at Remediation Properties:

a.    KETTLER will cause the common and public use areas of each Category IB, II and IIa Property to be surveyed by a Consultant selected from a list of four ERC-approved consultants in accordance with the procedures established in Section D.2. b. c. e. f. and g., provided that the costs of the survey charged by the selected Consultant shall be paid for as follows: KETTLER shall be responsible for the survey costs up to $2,000 plus reasonable and necessary expenses incurred by the Consultant. To the extent the survey costs of the selected Consultant exceeds this amount, the next $3,000 of survey costs shall offset the remediation fund for that property as described in Section D.3.b. on a dollar for dollar basis; provided, however that with respect to Category IIa Properties, KETTLER shall be responsible for all survey costs and none of the costs shall be borne by the remediation fund established for the Category IIa Properties. In no event shall the costs of any such survey exceed $5,000 plus the reasonable and necessary expenses for that survey. On the basis of this survey, KETTLER will create a written summary of any issues affecting accessibility or usability, including discrepancies with HUD Safe Harbors. KETTLER and ERC will use best efforts to complete all such surveys within one year from the date of entry of this Agreement. Within 15 days of receipt of the written summary, the ERC will provide KETTLER with a prioritization of the alterations to be made to improve the accessibility of the common and public use areas at the property (the "Priority List").

b.  KETTLER will cause the common use and public use areas at each Category IB, II and IIa Property to be altered pursuant to the Priority List.  In no event will KETTLER be required to make alterations for the common and public areas at any single Category IB or II Property in excess of $75,000.  With respect to Category IIa Properties, KETTLER will not be requied to make alterations for the common and public areas that exceed $40,000 for each such Property.  All such alterations under this paragraph 3.b shall be made within the term of this Agreement; provided, however, that if such alterations are not completed within one year of KETTLER's receipt of the Priority List, the $75,000 and $40,000 figures shall be adjusted on an annual basis based on the change in urban CPI for such year.

c.  In implementing alterations at the common and public use areas at the Category IB, II and IIa Properties, KETTLER will take all commercially reasonable steps to insure that alterations are estimated and completed at the "best and lowest" costs.  Upon request from the ERC, KETTLER will allow the ERC to review all documentation relating to the estimating and completion of alterations at the common and public use areas of the Category IB, II and IIa Properties.

d.  ERC acknowledges that the condominium unit owner's association (the "UOA"), rather than KETTLER, controls the common and public use areas in the Category IB Properties referred to herein as Midtown Alexandria Station, The Residences at Lorton Station and Midtown Reston Town Center.  KETTLER agrees to use commercially reasonable efforts, including but not limited to advising each UOA that the remediation work will be done at no cost to the UOA or its members, to cause the UOA to consent to the inspections and work required hereunder with respect to such Properties.  If, within twenty-four (24) months of the date of this Agreement,  despite such commercially reasonable efforts KETTLER is unable to obtain the UOA's consent to the work, 1) KETTLER will  provide to the ERC copies of all written communications between KETTLER and the UOA related to this issue and, 2) the applicable Categroy IB Property will be released from this Agreement (using the form of Release shown at Appendix 6A), but nothing herein shall prejudice the ERC's right to proceed directly against the UOA and/or its members with respect to any alleged FHA or ADA violations.

4.  <u>Minimum Number of Remediated Covered Dwelling Units:</u>  Subject only to the provisions of paragraphs 5.b, c and d, of this Section,  KETTLER will survey and remediate as necessary no fewer than 975 apartment or

condominium covered dwelling units[2] (exclusive of units in properties under construction or to be constructed except as indicated in Appendix 2) or substitute covered dwelling units, as defined in subparagraph 5 below, during the term of this Agreement. Notwithstanding the foregoing, if Metropolitan Largo is released from this Agreement pursuant to Section E(2) hereof, the 975 apartments or condominium covered dwelling units shall be reduced to 925.

5.   Substitution of Agreement Properties:

    a.   KETTLER will have the right to substitute remediation of any number of Category IA covered dwelling units, not to exceed 20% of the covered dwelling units in any single Category IA Property, with:

        (i.)   remediation of a comparable number of units in any Category IB, II or IIa Property to be in compliance with Paragraph 2 above.

        (ii.)   to-be-built townhouses or single-family homes that include certain agreed-upon accessibility features identified in Appendix 5.

    b.   The parties recognize that KETTLER has been committed to the development of affordable housing and that a number of the Category II or IIa properties contain, as of February 1, 2009, "affordable" units in the metropolitan statistical area where the properties are located, for families earning at or below 80% of the applicable Area Median Income under the HUD guidelines. For any such "affordable" unit in a Category II or IIa property that is remediated, KETTLER will receive double credit toward its Minimum Remediated Units. KETTLER may also receive double credit toward its Minimum Remediated Units for construction of new "affordable" units in the future; however for future construction, "affordable" units are those that are "affordable" in the metropolitan statistical area where the units are located, for families earning at or below 60% of the applicable Area Median Income under the HUD guidelines. In addition, the provision concerning future construction shall not apply to any to be constructed affordable housing that is currently planned by KETTLER, or for which KETTLER otherwise receives any governmental consideration or concession, other than any local, state or federal tax credits or favorable financing arrangements.

---

[2] "Covered dwelling units" means those units subject to the FHA pursuant to the definition of "covered multifamily dwellings" as set forth in 42 U.S.C. § 3604(f)(7).

c.    KETTLER will receive double credit toward its Minimum Remediated Units for creating appropriately dispersed "Type A " units not otherwise required by law.  For purposes of this section, "Type A" units are those that are built to comply with the provisions of ICC/ANSI A117.1-2003 Section 1003.

d.    Notwithstanding the foregoing provisions, the total number of units to be surveyed and remediated as necessary will not be reduced by more than 10% as a result of the substitution process.

e.    To the extent that KETTLER chooses to substitute remediation of units in a Category IB, Category II or Category IIa property under the provisions of Section D.5.b, for units in a Category IA property, the following shall apply:

    (i.)    In the event that KETTLER remediates between 5 and 10 units dispersed in no more than any two buildings in any one Category IB, Category II or Category IIa property, provisions of Section D.3 shall apply, provided however that the amount of the funds provided by KETTLER for remediation of the public and common areas at any such property shall not exceed $90,000.

    (ii.)    In the event that KETTLER remediates between 1 and 4 units dispersed in no more than one building in any one Category IB, Category II or Category IIa property, the provisions of Section D.3 shall apply.

    (iii.)    In the event that KETTLER chooses to substitute remediation of units in a Category IB, Category II or Category IIa property for units in a Category IA property under circumstances where the provisions of Section D.3 shall apply, KETTLER shall provide the ERC with notice of its intention to substitute units at least 15 days prior to the inspections of the property as required in Section D.3.a. Such notice shall include specific identification (by apartment number) of each unit(s) that will be remediated under the substitution provisions of this agreement.

Other than as provided above in Subsections (i) through (iii) of this paragraph, to the extent that KETTLER chooses to substitute remediation of units in a Category IB, Category II or Category IIa property under the provisions of Section D.5.a. through c., the provisions of Section D.3. shall not apply and the public and

common areas of all such Category IB, Category II and Category IIa properties shall be subject to the provisions of Section D.2.

6.    Time of Completion of Remediation Activities:  The Parties agree to the completion of the remediations contemplated in this Section D on the following timelines:

    a.    Alterations with respect to Category IA properties, including the public and common use areas of those Category IA properties, shall be completed within three (3) years of the execution of the Property Alteration Agreement for that property.

    b.    Alterations with respect to Category IB, Category II and Category IIa Properties shall be completed within 36 months of KETTLER's receipt of the Priority List for each property.

7.    Actions as to Individual Tenants:

    a.    Within 60 days of the date of the entry of this Agreement, KETTLER will submit to the ERC for review and comment a written policy regarding reasonable accommodations, reasonable modifications and tenant requests for unit adaptations at Properties owned by KETTLER as identified in Appendix 2 (the "Policy").

    b.    Once the Policy is reviewed by the ERC, the Policy will be incorporated into the form lease agreement to be signed by all current tenants at Category I,, II and IIa Properties which are owned by KETTLER, upon lease renewal and all future tenants of the property during the duration of this Agreement provided that KETTLER is still the owner.  The lease addendum will be separately read and signed/initialed by each resident, thereby informing each tenant that:

        (i)    a tenant of a Category I , IIor IIa Property who has a disability, who becomes disabled during the term of this Agreement, or who can demonstrate recurring visitation by persons with a disability may request certain features of accessibility and adaptive design which would benefit the resident or the visitor, as determined by agreement of the Parties, retrofitted in the tenant's unit consistent with the design standards set forth in Paragraph D.2; and

        (ii)    the retrofits in paragraph (i) above will be offered at no cost to the tenant.

      (iii)   Reasonable accommodations and reasonable modifications shall conform to HUD and the Department of Justice guidance on reasonable accommodations and reasonable modifications..

   c.   If KETTLER receives a written or oral request from a tenant to provide a unit adaptation under this Paragraph D.7, KETTLER will notify the ERC of the request and will undertake commercially reasonable steps to respond to the request and commence and complete the alterations within 90 days from the date of the tenant's request.  KETTLER will create and maintain records of all requests, responses, and alterations completed under this Paragraph D.7.  Within 15 days after the alterations are made, the ERC will be given notice that includes, 1) a description of the requested alterations; 2) a description of the actual alterations made by Kettler; and 3) photos of the alterations made sufficient so the ERC can effectively monitor the process.  At the election of the tenant, ERC shall also be given the name, address and contact information (phone number and e-mail address if available) of the tenant.  Where such permission is given by the tenant, the information shall be included with the 15 day notice described in this Section.

   d.   In lieu of performing the retrofits required under this Paragraph D.7, KETTLER may comply with this paragraph by offering relocation of the requesting tenant to another unit within the same property ("Relocation Unit"), if:

      (i)   the Relocation Unit is comparable with the requesting tenant's unit in layout, features, location, and size or, if the unit is otherwise acceptable to the tenant; and

      (ii)   the Relocation Unit is altered at the tenant's request consistent with the design standards set forth in paragraph D.2; and

      (iii)   such relocation is provided at no cost to the requesting tenant.

8.   <u>Dislocation of Tenants</u>: KETTLER will attempt to minimize any dislocation to current and future tenants caused by the alterations. KETTLER will compensate current or future tenants for the cost of temporary housing and reimbursement of out of pocket expenses caused by the construction.

9.   <u>No Pass-Through of Costs to Tenants:</u>  KETTLER agrees that no additional rent, deposit, or other fee may be charged solely because of contemplated or completed remediations at any Remediation Properties.

- 12 -

10. <u>Inspection and Certification of Completed Remediations at Properties</u>

    a.    The Consultant(s) will be retained by KETTLER to conduct on-site inspections of the remediations that have been performed at each Remediation Property to determine if they have been completed in accord with the Property Alteration Agreement and the ERC Priority List, as applicable.

    b.    Upon completing the remediation at a Remediation Property, KETTLER will provide notice to the ERC and the Consultant(s) (the "Completion Notice"). Within 21 days after receipt of the Completion Notice, and upon no less than seven days notice to KETTLER, if reasonably possible, the Consultant(s) will conduct the on-site inspection.   Inspections will be carried out so as to minimize, to the extent possible, disruption to tenants.

    c.    Within 14 days following each on-site inspection, the Consultant(s) will set out the results of each inspection, if reasonably possible, including deviations in compliance with the Property Alteration Agreement, if any, in writing, and will send the report to the Parties.

    d.    KETTLER will make a good faith effort to correct any deviations from the Property Alteration Agreement in all units requiring the same alteration within 90 days following receipt of the report from the Consultant.  All costs associated with these inspections and any corrections to remedy deviations will be paid by KETTLER. Following inspection and completion of the work, the Consultant shall issue a written certification that all alterations at the relevant Remediation Property have been satisfactorily completed in accordance with the Property Alteration Agreement or Priority List for that property.  Upon final completion of said alterations, and certification by the Consultant, the ERC will provide KETTLER with triplicate originals of a release in the form attached hereto as Appendix 6 with respect to such property.

    e.    If the Consultant cannot complete the inspections in the time provided, reasonable additional time will be permitted.

11. <u>Future Compliance</u>

KETTLER, including its agents and subsidiaries and its successors and assigns, shall comply with the relevant accessibility provisions of the FHA and ADA in connection with the design and construction of their future covered multi-family housing.

E.      **RELEASE**

    1.    <u>Remediation Properties</u>: As to each Remediation Property, upon completion and issuance of certification by the Consultant of completion of the alterations performed at a specific Remediation Property in compliance with this Agreement, the ERC will promptly execute and deliver to KETTLER a release in the form set forth in Appendix 6.  In addition, a default by KETTLER under this Agreement shall not affect ERC's obligations hereunder  to continue to inspect, certify and release Remediation Properties at the request of the owner of any Remediation Property, provided that KETTLER or such owner pays the Consultant's fees therefor with respect to any Remediation Property for which a release is requested.

    2.    <u>Metropolitan Largo</u>  If, on or before December 31, 2010 the project known as Metropolitan Largo (located at 8831 Lottsford Road, Largo, Maryland) is foreclosed upon, conveyed to the lender or its designee via a deed in lieu of foreclosure, or required by the lender to be sold for a price less than the current indebtedness secured by the project, the Metropolitan Largo project shall be released from this Agreement (using the form shown in Appendix 6A) and KETTLER shall have no further obligations with respect to such project hereunder.  However, such release shall be without prejudice to the ERC's right in the future to pursue a new action with respect to such project.

F.      **NEW KETTLER MULTIFAMILY RESIDENTIAL PROJECTS**

    1.    For  the term of this Agreement, KETTLER will have all future new construction multifamily residential projects designed, constructed, and/or majority owned by KETTLER or its subsidiaries or affiliates, except for those projects in which the KETTLER-related entity for the project is only acting as the General Contractor or as a third party property manager, reviewed during design and construction by a third-party fair housing and ADA consultant with knowledge and expertise in the requirements of the FHA and the ADA.

    2.    During the term of this Agreement, the ERC will be allowed to review and comment on KETTLER's program of third-party reviews.

    3.    Following execution of this Agreement, KETTLER shall promptly submit the plans for Metropolitan Two project to a third party design professional for a review of the plan's compliance with the design and construction requirements of the FHA and ADA.

G.      **PROMOTION OF PUBLIC AWARENESS OF ACCESSIBLE HOUSING PRACTICES**

1.  Initial Press Release:  Within ten (10) days of the entry of this Agreement, the ERC will cause to be disseminated to its customary press contacts a press release to publicize in a positive light KETTLER's actions described herein in promoting accessible housing.

2.  Advertising:  KETTLER will make good faith and commercially reasonable efforts to include in all future advertising and promotional literature – including newspapers, pamphlets, and brochures – and on its Internet website:  (i) a statement that KETTLER is an FHA and ADA compliant builder, (ii) an appropriately sized Equal Housing Opportunity (EHO) logo, which consists of a house with an equal sign inside, plus the "Equal Housing Opportunity" slogan underneath, and (iii) an appropriately sized universal sign of a person in a wheelchair.

3.  Nondiscrimination Signage:  KETTLER will, within thirty (30) days of the entry of this Agreement, ensure and verify in writing to the ERC that each of its rental or sales offices at multifamily housing is in compliance with legal requirements regarding nondiscrimination signage.

4.  National Accessible Apartment Clearinghouse:  KETTLER will participate in the National Accessible Apartment Clearinghouse (www.accessibleapartments.org) and will, after completion of the alterations required under this Agreement, list each Category IA Property. KETTLER will update its listings on this website so as to maintain current information regarding the accessibility and availability of these properties to persons with disabilities.

## H.   **REPORTING**

During the term of this Agreement, in addition to any other reporting and disclosure requirements set forth throughout this Agreement, within 180 days after the entry of this Agreement, and on the annual anniversary date of the entry of this Agreement, KETTLER will submit to the ERC a report containing a description of KETTLER's actions in the preceding period to comply with the training, remediation, and other requirements of this Agreement.

## I.   **MONETARY PROVISIONS**

1.  As KETTLER has previously paid $50,000 to the ERC in partial satisfaction of the provisions of this Paragraph, within five (5) business days of the entry of this Agreement, KETTLER will pay to the ERC, by wire transfer to counsel for the ERC, the additional sum of Two Hundred and Seventy-Five Thousand Dollars ($275,000).  On the one year anniversary of the entry of this Agreement, KETTLER will pay to the ERC, by wire transfer to counsel for the ERC, the sum of One Hundred Thousand Dollars ($100,000).  On the two year anniversary of the entry of

this Agreement, KETTLER will pay to the ERC, by wire transfer to counsel for the ERC, the sum of One Hundred Thousand Dollars ($100,000).

2.  During the term of this Agreement, KETTLER will pay reasonable attorneys' fees and costs actually incurred by the ERC and its counsel in monitoring KETTLER's compliance with the terms of this Agreement, which amounts shall not exceed $2,000 per calendar quarter.

J.  OBLIGATIONS OF KETTLER MANAGEMENT INC.

1.  Notwithstanding any other provision of this Settlement Agreement and Consent Decree, Kettler Management, Inc., shall be obligated to comply only with the following Sections: A, C, D.7-9, G.2-4, I.1-2, and K; provided further that in the event Kettler Management, Inc., is sold to a third party that is unaffiliated with KETTLER, the only obligations that Kettler Management, Inc., will continue to have are to comply with the terms in Sections A.1 and I.1.

K.  **MISCELLANEOUS**

1.  Term of Decree

This Agreement will remain in effect for four (4) years and, as to completion of unfinished alterations, until such time as final certification of all alterations contemplated hereunder are complete. KETTLER's obligation for guaranteed funding and participation in the MHRP shall continue for a total of ten years, except as provided in Paragraph A.2.

2.  Retained Jurisdiction to Enforce Decree

The Court will retain jurisdiction for the duration of this Agreement to enforce the terms of this Decree. Any party may move the Court to extend the duration of this Decree for good cause shown.

3.  Dispute Resolution

The ERC and KETTLER will endeavor in good faith to resolve informally any differences regarding interpretation of and compliance with this Agreement prior to bringing such matters to the Court for resolution. However, in the event of a failure by either Party to perform in a timely manner any act required by this Agreement or otherwise to act in accordance with any provision hereof, which is not subject to the dispute resolution process in Paragraph A.3, the other Party may move this Court to impose any remedy authorized by law or equity, including, but not limited to, an order requiring performance of such act or deeming such act to have been performed, and an award of any damages, costs, and

reasonable attorneys' fees which may have been occasioned by the violation or failure to perform.

4.    Time for Performance

The time frames imposed by this Agreement for the performance of certain acts may be extended by the mutual written agreement of the ERC and KETTLER without requirement of Court approval.

5.    Notice to the Parties

Notice to the Parties may be given by facsimile (if also mailed by first-class mail), in which case notice will be deemed to have been received on the day of transmission, as follows:

If to the ERC:                 Executive Director,
                               Equal Rights Center
                               Facsimile:  202-234-3106

                               *and*

                               Director, Fair Housing Project
                               Washington Lawyers' Committee for Civil
                               Rights & Urban Affairs
                               11 Dupont Circle, N.W., Suite 400
                               Washington, D.C.  20036
                               Facsimile:  202-319-1010
                               *and*

                               Fried Frank Harris Shriver & Jacobson LLP
                               1001 Pennsylvania Avenue, NW
                               Washington, D.C.  20004
                               Attn:  Douglas W. Baruch, Esq.

If to Kettler:                 Kettler Inc.
                               1751 Pinnacle Drive, Suite 700
                               McLean, Virginia  22102
                               Attn:  President

                               *and*

                               Kettler Management, Inc.
                               1751 Pinnacle Drive, Suite 700
                               McLean, Virginia  22102
                               Attn:  General Counsel

*and*

Holland & Knight LLP
2099 Pennsylvania Avenue, NW
Suite 100
Washington, DC 20006
Attn:  Christopher B. Hanback, Esq.

6.    Reservation of Other Claims

Nothing in this Agreement is intended to or shall be construed as releasing KETTLER or any other person or entity from liability to or claims by the ERC for any conduct other than what is specifically described in Section E (Release) of this Agreement.  ERC expressly reserves all such claims.

7.    Representations and Warranties

KETTLER represents and warrants that the list of Remediation Properties identified by KETTLER in Appendix 2 constitute all multifamily housing properties owned, in whole or in part, by KETTLER or a KETTLER-related entity as of the entry of this Agreement and which fall within the descriptions of Category IA, IB or II.

8.    Titles

The titles used in this Agreement are non-substantive descriptions included solely for the Parties' ease of reference and will not be construed to alter the substantive provisions of this Agreement.

9.    Counterparts

This Agreement may be executed in counterparts, all of which when taken together shall constitute a single instrument.

10.    Integration Clause

This Agreement, including the appendices thereto, constitutes the entire agreement and understanding between the Parties and supersedes all prior communications or negotiations between the Parties and their representatives regarding the matters contained in this Agreement. Evidence of prior negotiations (including but not limited to drafts of this Agreement and its related documents) may not be introduced in any proceeding to enforce the terms of this agreement.  Except as explicitly set forth in this Agreement, there are no representations, warranties, promises, or inducements, whether oral, written, expressed, or implied, that in any way affect or condition the validity of this Agreement or alter its terms. This Agreement may be amended only by a contemporaneous or

- 18 -

subsequent written instrument executed by all of the Parties hereto or by approval of the Court.  The wording of this Agreement was reviewed by legal counsel for each Party, and both Parties had sufficient opportunities to propose and negotiate changes in wording prior to its execution. Neither the ERC nor KETTLER will be entitled to have any wording of this Agreement construed against the other based on any contention as to which of the Parties drafted the language in question.

*[Signature Pages Follow]*

*Agreed this day,*

THE EQUAL RIGHTS CENTER

By: _____
Name: _DONALD L. KAHL_
Title: _EXECUTIVE DIRECTOR_

BY COUNSEL

By:_____
Douglas W. Baruch
Fried, Frank, Harris, Shriver & Jacobson LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004

and

Mary Hahn
Robert M. Bruskin
Washington Lawyers' Committee
For Civil Rights and Urban Affairs
11 Dupont Circle, NW, Suite 400
Washington, D.C.  20036

*Attorneys for the Equal Rights Center*

*[Signature Pages Continue]*

KETTLER INC., a Virginia corporation

By: _____
Name: Andrew W Buchanan
Title: President

KETTLER MANAGEMENT INC., a Virginia corporation

By: Cynthia M Clave
Name: Cynthia M Clave
Title: President

BY COUNSEL

By: _____
Christopher B. Hanback
Holland & Knight LLP
2099 Pennsylvania Avenue, NW
Suite 100
Washington, DC 20006

*Attorneys for Kettler, Inc., and Kettler Management, Inc.*

**So ordered.**

_____
United States District Judge

August 19, 2009

- 21 -

## LIST OF APPENDICES

| No. | Description |
| --- | --- |
| 1 | Employee Training Acknowledgment |
| 2 | Remediation Properties |
| 3 | Form of Property Alteration Agreement |
| 4 | Remediation Tolerances |
| 5 | Aging in Place Design Features |
| 6 | Form of Release |

## APPENDIX 1

### Employee Acknowledgement

I, _____, an employee of Kettler Company, or

one of its related companies, hereby acknowledge that I have received fair housing

training with specific emphasis on compliance with the accessibility requirements of the

FHA and ADA.


_____
[Employee name]


_____
Date

**APPENDIX 2**

**Remediation Properties**

| Property Name | Also Known As | Units | Address | City | State |
|---|---|---|---|---|---|
| Category 1(A) Properties | | | | | |
| Metropolitan at Lorton Station | | | 9030 Lorton Station Boulevard | Lorton | VA |
| Metropolitan at Largo Station | | | 8831 Lottsford Road | Largo | MD |
| The Gramercy at Metropolitan Park | | | 15th Street South and South Fern Street | Arlington | VA |
| Two Metropolitan Park | | | 1330 South Fern Street | Arlington | VA |
| Category 1(B) Properties | | | | | |
| Midtown Alexandria Station | | | 2451 Midtown Avenue | Alexandria | VA |
| Midtown Bethesda North | | | 5750 Bou Avenue | Bethesda | MD |
| The Residences of Lorton Station | | | 9000 Lorton Station Boulevard | Lorton | VA |
| | | | 9020 Lorton Station Boulevard | | |
| Midtown Reston Town Center | | | 11990 Market Street | Reston | VA |
| Midtown North | | | 12025 Old Dominion Parkway | Reston | VA |
| Category II Properties | | | | | |
| Chantilly Crossing | | | 13950 Rockland Village Drive | Chantilly | VA |
| County Center Crossing | | | 7000 Lakota Drive | Woodbridge | VA |
| Glen Ridge Commons | | | 12810 Island House Loop | Woodbridge | VA |
| Highland Commons | | | 12 Walker Lane | Warrenton | VA |
| Metropolitan at Pentagon City | | | 901 South 15th Street | Arlington | VA |
| Metropolitan at Pentagon Row | | | 1401 South Joyce Street | Arlington | VA |
| Metropolitan at Fairfax | | | 13161 Fox Hunt Lane | Herndon | VA |
| Sanger Place | | | 9454 Orange Blossom Trail | Lorton | VA |
| Springfield Crossing | | | 6704 Metropolitan Center Drive | Springfield | VA |
| The Fields at Cascades | | | 21260 Huntington Square | Sterling | VA |
| The Fields at Lorton Station | | | 8700 Lewis Chapel Circle | Lorton | VA |
| The Fields at Merrifield | | | 2929 Stillwood Circle | Merrifield | VA |
| The Fields of Ashburn | | | 43848 Dodge Terrace | Ashburn | VA |
| The Fields of Germantown | | | 12912 Falling Water Circle | Germantown | MD |
| The Fields of Herndon I/II | | | 2450 Masons Ferry Drive | Herndon | VA |
| The Fields of Manassas | | | 7431 Willoughby Lane | Manassas | VA |
| The Fields of Sterling | | | 46910 Shady Point Square | Sterling | VA |
| Woodmont Crossing | | | 2327 Good Hope Court | Washington | DC |

| Category IIa Properties | | | | | |
|---|---|---|---|---|---|
| Culpeper Commons | | | 1301 Spring Meadow Lane | Culpeper | VA |
| Salem Commons | | Salem | 1866 Salem Commons Lane | Salem Commons | VA |
| Shenandoah Commons | | Front Royal | 9 Shenandoah Commons Way | Shenandoah Commons | VA |

## APPENDIX 3

### Form of Property Alteration Agreement

### *PROPERTY ALTERATION AGREEMENT*

*[This form to be customized by experts to delineate model types and other property-specific information.]*

*[Complex Name and Address]*

This Property Alteration Agreement (this "Agreement"), dated as of _____, 200__, is entered into by and among Kettler, Inc. ("KETTLER") and the Equal Rights Center, a not-for-profit corporation (the "ERC"), with respect to [ Property Name and Location ] (the "Property"). A site plan is attached hereto as **Exhibit A**.

### RECITALS

WHEREAS, KETTLER and the ERC (collectively, the "Parties") have entered into a Agreement (the "Agreement") which provides, among other things, that the Parties will agree upon alterations (the "Alterations") to be made to certain properties with which KETTLER has been involved, and

WHEREAS, a survey has been conducted of the Property, and

WHEREAS, the Parties desire to enter into an agreement concerning Alterations to be made at the Property,

NOW THEREFORE, pursuant to the terms of the Agreement, the Parties agree as follows:

**I.**     **General Provisions**

A.     Release. Upon completion, inspection and certification of the Alterations in accordance with this Agreement, the ERC will provide the Release specified in Paragraph E. 1 of the Agreement. Provision of the Release will be conclusive evidence of the satisfactory completion, inspection and certification of the Alterations in accordance with this Agreement.

B.     Counterparts. This Agreement may be executed in counterparts, all of which when taken together will constitute a single instrument.

**II.**     **Alterations to Public Areas:**

       1.     Issue:
            1.1.    Action:

    2.    Issue:
        2.1.   Action:

**III.**    <u>**Alterations to Common Areas:**</u>

    1.  Issue:
       1.1. Action:

    2.  Issue:
       2.1.

**IV.**    <u>**Alterations to Units:**</u>

    1.  Issue:
       1.1. Action:

    2.  Issue:
       2.1. Action

EQUAL RIGHTS CENTER

By:_____

Name:_____

Title:_____


My commission expires:_____

KETTLER INC.

By:_____

Name:_____

Title:_____

## APPENDIX 4

### Remediation Tolerances

With respect to the Remediation Properties, remediations will be made to one or more "Safe Harbors," selected by KETTLER, and modified as follows[2]:

a.   <u>Thresholds:</u>  all thresholds, in units, having a vertical rise of more than ¼" but no more than ¾" will either be beveled or replaced with a conforming threshold.  Thresholds having a vertical rise in excess of ¾" will be replaced with conforming thresholds.

b.   <u>French Door Thresholds:</u>  vertical rise on French door threshold may, if ramped at a ratio of 1:12, be up to 1".

c.   <u>Patio/Balcony Thresholds:</u>  at all patio and balcony thresholds having an interior vertical rise of more than ¼," but no more than 1" a ramping mechanism at 1:2 from ¼" to ¾", or at 1:12 from  ¾" to 1", may be installed so as to make the doorway accessible to persons using wheelchairs.  Thresholds with an interior vertical rise of more than 1" will be replaced with one meeting all other criteria of a Safe Harbor.

d.   <u>Doors:</u>

   (i)   In the event that a door to an accessible bathroom is in compliance with the selected Safe Harbor, a second door to that same bathroom will not be required to be remediated;

   (ii)   The interior door width requirement of 32" nominal (31.5") may be met through the use of offset hinges;

   (iii)   Closets of 26" or lesser depth will not be required to meet 32" nominal width door requirements.

e.   <u>Kitchens:</u>

   (i)   Clear floor space on sinks and applicable appliances may be off-center by up to 2";

---

[2] "Safe Harbor" means any of the following: a) ANSI A117.1 (1986); the Fair Housing Accessibility Guidelines (HUD, 1991);  the Fair Housing Design Manual (1998); the Guidelines and Supplemental Questions and Answers (HUD, June 28, 1994); CABO/ANSI A117.1 (1992); ICC/ANSI A117.1(1998); the Code Requirements for Housing Accessibility (CRHA, 2000); the International Building Code (2000, with 2001 Supplement); the International Building Code (2003); the International Building Code (2006); and b) any other Safe Harbor recognized by HUD.  To the extent KETTLER relies upon ANSI standards as a Safe Harbor, those standards will be read in conjunction with the Fair Housing Act, HUD's regulations, and the HUD Fair Housing Accessibility Guidelines.

   (ii)    In U-shaped kitchens, no remediation would be required if turning diameter is no less than 59". If diameter is less than 59" removable base cabinets sufficient to allow for "T-turns" would be sufficient;

   (iii)   In galley kitchens, no remediation would be required if the distance between the faces of the opposable elements (cabinets and appliances) is 39" or greater.

   (iv)   If the clear floor space is impinged by an appliance, the resident will be offered a smaller replacement appliance at no cost.

f.   <u>Switches, Outlets, and Environmental Controls</u>:

   (i)    Maximum height of 49" and minimum height of 14", each measured to the centerline of, respectively, the higher or lower receptacle or an outlet or switch or the centerline of the highest operable control of the thermostat; if higher than 49", lower to 47" or lower, and if lower than 14" raise to 16" or above;  and

   (ii)    Outlets over kitchen counters in inaccessible locations could remain if an equal number of outlets with comparable electrical capacity are provided in accessible locations within the same area. For purposes of this provision, the "same area" means that an accessible outlet is located within 36" or serves the same uninterrupted countertop as the inaccessible outlet, and is not within 32" of any corner.

g.   <u>Bathrooms (unless otherwise agreed upon)</u>:

   (i)    Clear floor space on sinks, toilet and tub may be off-center by up to 2";

   (ii)    Toilets at least 16" from the "grab bar" side wall and 14" from the "non-grab bar" side wall need not be repositioned. Off-set flanges may be used to reposition toilets requiring remediation;

   (iii)   countertop heights in unit bathrooms need not be altered if no higher than 35" AFF; and

   (iv)   wing-its may be used in lieu of cross-bracing as reinforcement for grab bars.

h.   <u>Mailboxes</u>

   (i)    If the lower rows of mailboxes are less than 49" they will not need to be repositioned so long as any tenant with a disability is provided the option to be assigned (or moved to) a mailbox on a level below 48".

i.  Common Use Areas:

   (i)    At least one route to the primary door and various parts of the clubhouse and leasing office must be "accessible" as defined by a recognized Safe Harbor;

   (ii)   reflective mirrors need not be altered if no more than 45" AFF, and mirror is tiltable:

   (iv)   signage need not be altered if it meets all other FHA and ADA criteria and is no more than 62" AFF measured to the center of the sign;

   (v)    grab bars for toilets need not be altered if no more that 35"- 37" AFF;

j.  Accessible Routes

   (i)    Site or legal constraints will be acknowledged as a basis to provide an accessible route to a secondary entrance;

   (ii)   Running Slopes and Cross Slopes:  unless otherwise agreed to by the parties (a) walkways (excluding at entries and landings) need not be altered as to running slope if their running slope is 5.25% or less, and the walkways are otherwise FHA and ADA compliant.  Walkway slopes above 5.25% will be altered to 5.00%, or will be considered ramps not walkways, and will have handrails on both sides except at curb ramps ; (b) ramps with running slopes of up to 8.75% (but complying with all other requirements for ramps) need not be altered.  Ramps with running slopes above 8.75% will be altered to no more than 8.33%;  (c) cross-slopes of walkways and ramps (but not at entries or landings) need not be altered as to cross-slope if the existing cross-slope is no greater than 4.00%, and the walkways and ramps are otherwise FHA and ADA compliant.  Walkways and ramps with cross-slopes in excess of 4.00% will be altered to no more than 2.00%;

   (iii)  accessible parking spaces need not be altered if they meet all other FHA and ADA requirements, and width is no less than 12';

   (iv)   handrail extensions need not be altered if they are no less than 11".

k.  Protruding Objects:  Sconces or other objects that protrude 5" or less as measured from the baseboards of the walls in hallways (if such baseboards are a uniform distance from the wall) or which are higher than 78" AFF and protrude any distance may remain.

l.  General Provisions: The Parties recognize that some remediation efforts would be impossible or substantially burdensome balanced against the

objectives of the FHA and ADA.  In such circumstances, the parties will, in good faith, seek alternative accessibility modifications or adaptations to mitigate the discrepancy with the Safe Harbor.

(i.)     In no event shall KETTLER be required to move a load bearing wall or a wall that would include relocating plumbing, electrical panels, or an HVAC chase, or to install an elevator as part of a retrofit, or to provide any remediation under this Agreement when no feasible alternative is identified.

(ii.)    If, after negotiating in good faith to agree on alternative accessibility modifications under this provision, the Parties remain in disagreement, either Party may promptly petition the court for a determination as to the extent of the retrofit to be performed, or for a determination that no retrofit need be made.

(iii.)   The applicability of this provision is limited to those situations in which a single alleged deficiency necessitates a retrofit with a substantial magnitude or burden.  This provision does not apply in situations where the cumulative effect of several alleged deficiencies results in a substantial magnitude or burden for fixing a single unit, nor will it be applied to any alleged deficiency that causes a retrofit with a substantial magnitude or burden only because a retrofit is necessary for a large number of units.

## APPENDIX 5
### "Aging in Place" Design Features

The Parties agree that any to-be-built townhome or single family home containing the following "Aging in Place" design features may be substituted by KETTLER pursuant to paragraph 6.a.ii of the Agreement:

### Exteriors:

1.   Deck, patio, or balcony surfaces no more than ½ inch below interior floor level if made of wood.

### Overall Floor Plan:

1.   No steps between rooms/areas on the same level.
2.   5 x 5 foot clear/turn space in main living area, U-shaped kitchen, and one bedroom, and in one bathroom.
3.   In galley kitchens, at least 40 inches between opposable elements.

### Hallways:

1.   In units 20 feet wide or wider, hallways minimum of 36 inches wide, wider to be considered; 32 inches wide where hallway is 24 inches or less long.
2.   Well lit.

### Entry:

1.   Accessible path of travel to home, wherever reasonably possible.
2.   At least one, no-step entry, wherever reasonably possible.
3.   32 inches of clear opening.
4.   Non-slip flooring in foyer as option.
5.   Entry door sidelight or high peep hole viewer; low peep hole viewer as option.
6.   Doorbell, if any, in accessible location.
7.   Levered door hardware.

### Thresholds:

1.   Flush preferable.
2.   Exterior maximum of ½ inch beveled.
3.   Interior maximum of ¼ inch.

### Interior Doors:

1.    32 inches of clear opening (this requires a 36 inch door).
2.    Levered door hardware.
3.    Reach-in closets of no more than 24 inches in depth are excluded.

## Windows:

1.    Easy to operate hardware

## Garage or Carport:

1.    Handrail if steps.
2.    Ramp to doorway if needed

## Faucets:

1.    Lever handles
2.    Thermostatic or anti-scald controls
3.    Pressure balanced faucets

## Kitchen and Laundry:

1.    Loop handles on kitchen cabinets and drawers that require handles (for cabinets or drawers that do not need handles, offer loop handles to buyer as option).
2.    Upper wall cabinetry three inches lower than conventional height
3.    Base cabinets with rollout trays and lazy susans
4.    Compliant spacing for at least one-half of electrical sockets in kitchens (46-inch AFF maximum height for side approach, 44-inch AFF with knee clearance for front approach, if over obstruction of less than 20-inch, 48-inch AFF).
5.    Optional front-loading laundry machines with accessible controls where washers and dryers offered as an option.

7.    30-inch by 48-inch clear space at appliances, or 60-inch diameter clear space for turns in U-shaped kitchens.
8.    Pull-out spray faucet; levered handles.

## Bathrooms:

1.    At least one wheelchair maneuverable bath on the entry level of the unit with acceptable turning space and 36-inch by 36-inch or 30-inch by 48-inch clear space.
2.    Bracing in walls around tub, shower, shower seat, and toilet for installation of grab bars to support 250-300 pounds.
3.    Central mixing valve for water control on standard bathtubs.

4.      Toilets with Safe Harbor compliant spacing from sidewalls in compliant bathroom floor plans.

## Stairways:

1.      Adequate hand rail on one side of stairway, 1 ¼-inch diameter.
2.      In multi-story homes, either pre-framed shaft (e.g. stacked closets) for future elevator or stairway width minimum of 4 feet to allow for lift
3.      Blocks or other support in walls for installation of chair lift if necessary for optional chair lift installation.

## Ramps:

1.      Slope no greater than 1-inch rise for each 12 inches in length, compliant/adequate handrails.
2.      5-foot landing provided at exterior accessible entrance.
3.      2-inch curbs or a railing for safety where required.

## Electrical:

1.      Light switches, thermostats, and other environmental controls placed in accessible locations - no higher than 48 inches to center of highest operable part and no lower than 15 inches to center of lowest operable part.
2.      Audible and visual/strobe smoke detectors.
3.      Rocker or touch light switches

## Flooring:

1.      Smooth, non-glare, non-slip surfaces interior and exterior as option.
2.  If carpeted, low (less than ½ inch high pile) density, with firm pad as option.

**APPENDIX 6**

### Form of Release For [Property Name]

The Equal Rights Center (and its affiliates, successors, or assigns) covenants and agrees that it will forever refrain from instituting, maintaining, prosecuting, or continuing to maintain or prosecute any suit or action or proceeding or assisting others with any suit or action or proceeding against Kettler Inc., Kettler Management Inc., [_____] (name of LLC that owns the property at the time of suit and name of LLC that owns the property at the time of release), their respective members, co-owners, partners, subsidiaries and affiliates, successors, agents and assigns, and other entities or individuals which have or, in the past, had an ownership interest in [Property Name], or which had a role in the design or construction of [Property Name], as well as the officers, directors, managers, trustees, employees and agents of such entities or individuals and the respective successors and assigns of all of those herein (collectively, the "KETTLER-Released Parties"), alleging claims under the Fair Housing Act Amendments of 1988 related to the design and construction of multifamily housing, the Americans with Disabilities Act, and any state or local accessibility law relating to [Property Name], except related to changes (other than those made pursuant to the Settlement Agreement and Consent Decree, dated_____, 2009 in the Equal Rights Center, vs. Kettler Inc. and Kettler Management Corp., Case No. 1:07-cv-01017 in the United States District Court for the District of Columbia (the "Agreement")) made after the survey, remediation if necessary and final inspection pursuant to the Agreement.

With respect to [Property Name] ERC and its successors hereby irrevocably and forever release, acquit and discharge the Kettler-Released Parties from all claims, obligations, causes of action, actions, liability, claims, damages and costs and expenses of

any nature whatsoever related to the design or construction of that Remediation Property under  the FHA, ADA, and any similar state or local accessibnility law or building code that were brought or could have been brought as of this date, whether at law or in equity and whether known or unknown.

## APPENDIX 6A

### [Limited Release  for properties where no remediation was done and claims against others may be brought]

#### Form of Release For [Property Name]

The Equal Rights Center (and its affiliates, successors, or assigns) covenants and agrees that it will forever refrain from instituting, maintaining, prosecuting, or continuing to maintain or prosecute any suit or action or proceeding or assisting others with any suit or action or proceeding against Kettler Inc., Kettler Management Inc., [_____] (name of LLC that owns the property at the time of suit and name of LLC that owns the property at the time of release, excluding Unit Owners Association as per paragraph D.3.d or current owner of Metropolitan Largo if no longer owner by KETTLER), their respective members, co-owners, partners, subsidiaries and affiliates, successors, agents and assigns, and other entities or individuals which have or, in the past, had an ownership interest in [Property Name], or which had a role in the design or construction of [Property Name], as well as the officers, directors, managers, trustees, employees and agents of such entities or individuals and the respective successors and assigns of all of those herein (collectively, the "KETTLER-Released Parties"), alleging claims under the Fair Housing Act Amendments of 1988 related to the design and construction of multifamily housing, the Americans with Disabilities Act, and any state or local accessibility law relating to [Property Name], except related to changes (other than those made pursuant to the Settlement Agreement and Consent Decree, dated_____, 2009 in the Equal Rights Center, vs. Kettler Inc. and Kettler Management Corp., Case No. 1:07-cv-01017 in the United States District Court for the District of Columbia (the "Agreement")) made after the survey, remediation if necessary and final inspection pursuant to the Agreement.

With respect to [Property Name] ERC and its successors hereby irrevocably and forever release, acquit and discharge the Kettler-Released Parties from all claims, obligations, causes of action, actions, liability, claims, damages and costs and expenses of any nature whatsoever related to the design or construction of that Remediation Property under  the FHA, ADA, and any similar state or local accessibnility law or building code that were brought or could have been brought as of this date, whether at law or in equity and whether known or unknown; provided, however that nothing in this Release shall be construed as a release of any claims against [Unit Owners Association and members therein as referred to in paragraph D.3.d.of the Settlement Agreement and Consent Decree or current owner(s) of Metropolitan Largo should the provisions of paragraph E.2. of the Settlement Agreement and Consent Decree apply].